UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESUS PIMENTEL, et al., | Case No. CV 14-1371 FMO (Ex) |
| Plaintiffs, | |
| v. | **ORDER RE: MOTION FOR SUMMARY JUDGMENT** |
| CITY OF LOS ANGELES, | |
| Defendant. | |

Having reviewed and considered all the briefing filed with respect to defendant's Motion for Summary Judgment (Dkt. 110, "Motion"), the court finds that oral argument is not necessary and concludes as follows. See Fed. R. Civ. P. 78; Local Rule 7-15; Willis v. Pac. Mar. Ass'n, 244 F.3d 675, 684 n. 2 (9th Cir. 2001).

**INTRODUCTION**

On February 24, 2014, Jesus Pimentel ("Pimentel") and David R. Welch ("Welch") filed a Complaint on behalf of themselves and all persons similarly situated against the City of Los Angeles ("the City" or "defendant"). (See Dkt. 1, Complaint). The Complaint asserted causes of action for violations of the: (1) Excessive Fines Clause of the Eighth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983; (2) excessive fines provision of Article I, Section 17 of the California Constitution; (3) Due Process Clause of the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983; and (4) due process clause of Article

I, Section 7(a) of the California Constitution. (See id. at ¶¶ 35-51). The court dismissed the original Complaint with leave to amend. (See Dkt. 26, Court's Order of June 17, 2014).

Pimentel, Welch, as well as additional plaintiffs Jeffrey O'Connell ("O'Connell"), Edward Lee ("Lee"), Wendy Cooper ("Cooper"), Jaclyn Baird ("Baird"), Anthony Rodriguez ("Rodriguez"), Rafael Buelna ("Buelna"), and Elen Karapetyan ("Karapetyan") (collectively, "plaintiffs"), subsequently filed a First Amended Complaint ("FAC"), asserting the same causes of action. (See Dkt. 29, FAC at ¶¶ 56-72). On September 29, 2015, the court granted in part and denied in part the City's motion to dismiss the FAC. (See Dkt. 43, Court's Order of September 29, 2015, at 17). The court granted the City's motion as to plaintiffs' due process claims and their claims for any monetary relief under the California Constitution, but permitted plaintiffs to proceed on their Excessive Fines claim under the United States Constitution and the California Constitution. (See id.). Plaintiffs then filed the Second Amended Complaint ("SAC"), the operative complaint in this case, alleging their excessive fines claims. (See Dkt. 44, SAC at ¶¶ 56-66).

## BACKGROUND[1]

Pursuant to its authority under California law to impose civil parking penalties, see Cal. Veh. Code §§ 40203.5(a)-(b), the Los Angeles City Council ("City Council") has adopted a penalty schedule for various parking meter violations. (See Dkt. 110-2, Statement of Uncontroverted Facts [] ("SUF") at D2-D3). These parking meter violations include failing to: (a) pay at a parking meter, see Los Angeles Municipal Code ("the Code" or "Mun. Code") § 88.13(a); (b) pay for "over-time" use of a metered space, see id. at § 88.13(b); (c) pay at a meter located at an airport, see id. at § 89.35.5(a); (d) remove a vehicle when an airport-located meter expires, see id. at § 89.35.5(b); and (e) pay for the over-time use of an airport-located parking meter. See id. at § 89.35.5(c).

Since 2012, the initial penalty for a parking meter violation has been $63. (Dkt. 110-2, SUF at D4); Mun. Code at §§ 88.13(a), 88.13(b), 89.35.5(a), 89.35.5(b) & 89.35.5(c). If the initial

---

[1] Unless otherwise indicated, the following facts are undisputed and/or contain disputes that are not material.

penalty is not timely paid, a late penalty of $63 is assessed.  (See Dkt. 110-2, SUF at D6); Mun. Code at §§ 89.60, 88.13(a), 88.13(b), 89.35.5(a), 89.35.5(b) & 89.35.5(c).  Another late payment penalty of $25 is imposed if the City does not receive payment within 58 days from the date the citation is issued.  (Dkt. 110-2, SUF at D7); Mun. Code at §§ 88.13(a), 88.13(b), 89.35.5(a), 89.35.5(b) & 89.35.5(c).  If payment is not made within 80 days from the date of the citation, a $3 Department of Motor Vehicle ("DMV") hold fee and a $27 collection fee[2] are assessed, bringing the total amount owed to $181.  (Dkt. 110-2, SUF at D8-D9).  If the $181 is not paid after this point, no further penalties or fees are imposed.  (See id. at D10).  In other words, the maximum possible monetary liability for a meter violation is $181.  (See id. at D10-D11).

Revenue collected from parking meters – i.e., the money timely paid into parking meters and not derived from late penalties – is placed into a special parking revenue fund.  (See Dkt. 110-2, SUF at D18).  This fund is used to pay for parking meter maintenance, installation, repairs and security, as well as the design, construction and operation of off-street parking lots and other activities.  (See id. at D19).

Approximately $12.50 to $17.50 of the initial $63 penalty is paid to the County of Los Angeles and the State of California.  (See Dkt. 110-2, SUF at D12); (Dkt. 110-1, Joint Evidentiary Appendix Regarding Defendant's Motion for Summary Judgment ("Joint App'x")[3] at Exhibit ("Exh.") 1, Declaration of Arlene N. Hoang at Exh. A, Defendant's March 16, 2017, Rule 30(b)(6)[4] Deposition of Robert Andalon ("Andalon Depo. II") at 131); (id. at Exh. 16, Andalon Depo. II at 29-30).  Of the amount remaining after the county and state assessments, a portion goes to fund the City's parking enforcement operations and another portion goes to the City's "General Fund."  (See Dkt. 110-2, SUF at D14-D15; Dkt. 110-1, Joint App'x at Exh. 1, Andalon Depo. II at 131; see also id. at Exh. 16, Andalon Depo. II; id. at Exh. 35, City Controller "Where Your Money Goes"

---

[2] The collection fee was recently increased from $21 to $27.  (See Dkt. 110-2, SUF at D9).

[3] The parties failed to file their Joint Evidentiary Appendix on the Case Management/Electronic Case Files ("ECF") system.  (See, generally, Dkt.).

[4] Unless otherwise noted, all "Rule" references are to the Federal Rules of Civil Procedure.

3

Publication ("City WYMG Publication")). For fiscal year 2016, roughly 75 percent of revenue generated from parking citations, including but not limited to meter violations, went to funding parking enforcement operations, and the remaining 25 percent went to the City's General Fund.[5] (See Dkt. 110-2, SUF at D15). The City's General Fund pays for services such as the police and fire departments. (See Dkt. 110-1, Joint App'x at Exh. 35, City WYMG Publication; id. at Exh. 37, January 10, 2017, City Controller Press Release ("City Jan. 10, 2017, Press Rel."); id. at Exh. 39, City Controller "State Scoop" Publication ("City SS Publication")).

## LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure authorizes the granting of summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The standard for granting a motion for summary judgment is essentially the same as for granting a directed verdict. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511 (1986). Judgment must be entered "if, under the governing law, there can be but one reasonable conclusion as to the verdict." Id.

The moving party has the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each cause of action upon which the moving party seeks judgment. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553 (1986). If the moving party fails to carry its initial burden of production, "the nonmoving party has no obligation to produce anything." Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1102-03 (9th Cir. 2000).

If the moving party has sustained its burden, the burden then shifts to the nonmovant to identify specific facts, drawn from materials in the file, that demonstrate that there is a dispute as to material facts on the elements that the moving party has contested. See Celotex, 477 U.S. at 324, 106 S.Ct. at 2553; Anderson, 477 U.S. at 256, 106 S.Ct. at 2514 (A party opposing a

---

[5] Although plaintiffs dispute that 75 percent of "the funds from [] parking meter citations covers the City's expenses" for parking meter enforcement, they do not specifically dispute that some portion of the revenue from meter citations goes to enforcement costs. (See, generally, Dkt. 110-2, SUF at D15).

properly supported motion for summary judgment "must set forth specific facts showing that there is a genuine issue for trial.").[6] A factual dispute is material only if it affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth. See SEC v. Seaboard Corp., 677 F.2d 1301, 1306 (9th Cir. 1982). Summary judgment must be granted for the moving party if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322, 106 S.Ct. at 2552; see Anderson, 477 U.S. at 252, 106 S.Ct. at 2512 (parties bear the same substantive burden of proof as would apply at a trial on the merits).

In determining whether a triable issue of material fact exists, the evidence must be considered in the light most favorable to the nonmoving party. See Barlow v. Ground, 943 F.2d 1132, 1134 (9th Cir. 1991), cert. denied, 505 U.S. 1206, 112 S.Ct. 2995 (1992). However, summary judgment cannot be avoided by relying solely on "conclusory allegations [in] an affidavit." Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888, 110 S.Ct. 3177, 3188 (1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986) (more than a "metaphysical doubt" is required to establish a genuine issue of material fact). "The mere existence of a scintilla of evidence in support of the plaintiff's position" is insufficient to survive summary judgment; "there must be evidence on which the [fact finder] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252, 106 S.Ct. at 2512.

## DISCUSSION

I. APPLICABILITY OF EXCESSIVE FINES CLAUSE.

Defendant contends, as "a threshold issue," that the Eighth Amendment's prohibition on excessive fines cannot be applied to decisions made by the Los Angeles City Council because: (1) "the United States Supreme Court has not addressed whether the Eighth Amendment applies

---

[6] "In determining any motion for summary judgment or partial summary judgment, the Court may assume that the material facts as claimed and adequately supported by the moving party are admitted to exist without controversy except to the extent that such material facts are (a) included in the 'Statement of Genuine Disputes' and (b) controverted by declaration or other written evidence filed in opposition to the motion." Local Rule 56-3.

to a fine adopted by [a] legislature[;]" and (2) the Eighth Amendment "has not been incorporated to the states through the Fourteenth Amendment."[7] (See Dkt. 112-1, Joint Brief Regarding Defendant the City of Los Angeles' Motion for Summary Judgment ("Joint Br.") at 3 & 14-16). According to defendant,"the Excessive Fines Clause was drafted in an era in which the amount of [fines] was determined solely by the judiciary" and therefore was not intended to apply to decisions made by legislatures. (See Dkt. 112-2, Joint Br. at 14). Defendant's contentions are unpersuasive.

The Supreme Court's excessive fines cases in the forfeiture context deal directly with statutory penalties developed by a legislative body, i.e., the United States Congress. See, e.g., United States v. Bajakajian, 524 U.S. 321, 324, 118 S.Ct. 2028, 2031 (1998) ("The question in this case is whether forfeiture" pursuant to 18 U.S.C. § 982(a)(1) "would violate the Excessive Fines Clause of the Eighth Amendment."). Also, while neither party identifies Supreme Court precedent applying the Excessive Fines Clause to a fine imposed by a state or municipal legislative body, (see, generally, Dkts. 112 & 113, Joint Br.), defendant itself relies on lower court cases which do so. (See, e.g., Dkt. 113-2, Joint Br. at 35-37 (citing Popescu v. City of San Diego, 2008 WL 220281, *4-5 (S.D. Cal. 2008) (applying Eighth Amendment to parking fines issued by the City of San Diego) & Wemhoff v. City of Baltimore, 591 F.Supp.2d 804, 808-09 (D. Md. 2008) (applying Eighth Amendment to Baltimore's parking fine schedule)). In short, defendant fails to persuade the court that the Eighth Amendment's protection against excessive fines should not apply here.

With respect to defendant's assertion that "the Excessive Fines Clause of the Eighth Amendment is not incorporated against the states through the Fourteenth Amendment[,]" (Dkt. 112-2, Joint Br. at 15), the Supreme Court has held that "[d]espite the broad discretion that States possess with respect to the imposition of criminal penalties and punitive damages, the Due Process Clause of the Fourteenth Amendment to the Federal Constitution imposes substantive limits on that discretion. That Clause makes the Eighth Amendment's prohibition against

---

[7] Defendant did not raise any of these "threshold" arguments in its motions to dismiss. (See, generally, Dkt. 12-1, Memorandum []in Support of Defendant's Motion to Dismiss Complaint; Dkt. 30-1, Memorandum [] in Support of Defendant['s] Motion to Dismiss the Fist Amended Complaint).

6

excessive fines and cruel and unusual punishments applicable to the States." Cooper Indus., Inc. v. Leatherman Tool Grp., Inc., 532 U.S. 424, 433-34, 121 S.Ct. 1678, 1684 (2001); see also Wright v. Riveland, 219 F.3d 905, 918-19 (9th Cir. 2000) (applying Eighth Amendment in reversing district court's dismissal of excessive fines claims challenging Washington state statute); Popescu, 2008 WL 220281, at *4-5; Wemhoff, 591 F.Supp.2d at 808-09. Defendant's reliance on McDonald v. City of Chicago, Ill., 561 U.S. 742, 130 S.Ct. 3020 (2010), is unpersuasive. The majority opinion in McDonald – a pro-incorporation decision which held that the Second Amendment's right to bear arms is applicable against the States, see id. at 750, 130 S.Ct. at 3026 – suggested in dicta that the Excessive Fines Clause of the Eighth Amendment had not been "fully incorporated" against the states. See id. at 765 n. 13, 130 S.Ct. at 3035 n. 13. The McDonald Court, however, failed to consider, let alone reverse, its own precedent in Cooper. See, generally, id. Under the circumstances, the court is persuaded that it is bound by the Cooper court's conclusion that the Eighth Amendment applies to the States.[8] See Cooper, 532 U.S. at 433-34, 121 S.Ct. at 1684.

II.  EXCESSIVE FINES CLAUSE.

Defendant asserts that the parking meter penalties caused by plaintiffs' violations approximate the negative impact on the community, local businesses, and the City's revenue. (See Dkt. 113-1, Joint Br. at 28-30). According to defendant, plaintiffs cannot overcome the wide deference owed to legislatures in setting appropriate penalty ranges for unlawful conduct and the "strong presumption" that a legislature's decision-making in this context is constitutional. (See Dkt. 112-3, Joint Br. at 24-25).

---

[8] Defendant makes no argument regarding the applicability of the excessive fines provision under the California Constitution, (see, generally, Dkts. 112 & 113, Joint Br.), even though it agrees that the analysis under both constitutional provisions is identical. (See Dkt. 112-3, Joint Br. at 18); (see also Dkt. 43, Court's Order of September 29, 2015, at 9) ("Article 1, Section 17 of the California Constitution states, '[c]ruel or unusual punishment may not be inflicted or excessive fines imposed.' Cal. Const. art. I, § 17. 'This section is a state equivalent to the Eighth Amendment.'") (quoting Brownlee v. Burleson, 2006 WL 2354888, *7 (E.D. Cal. 2006)) (alterations in original).

Plaintiffs respond that (1) they have made a prima facie showing of gross disproportionality between the offense and the penalties, (see Dkt. 112-3, Joint Br. at 21-24); (2) any deference "otherwise due [to] the City Council is greatly undermined" by the facts of this case, (see Dkt. 113-1, Joint Br. at 26-28); and (3) the City's proffered justifications for the penalty amounts are either "not supported by evidence" or "in material dispute." (See id. at 30-32). Plaintiffs attempt to dispute defendant's proposed undisputed facts by asserting 17 additional issues of material fact, (see Dkt. 110-2, SUF at P1-P17), that they claim preclude summary judgment.[9] (Dkt. 117, Plaintiffs' Supplemental Memorandum [] ("Pls.' Supp. Mem.") at 2-3).

In evaluating a claim under the Excessive Fines Clause, "the standard of gross disproportionality" requires a court to "compare the amount of the forfeiture to the gravity of the [] offense. If the amount of the forfeiture is grossly disproportional to the gravity of the defendant's offense, it is unconstitutional." Bajakajian, 524 U.S. at 336-37, 118 S.Ct. at 2037-38. Courts "typically consider[] four factors in weighing the gravity of the defendant's offense: (1) the nature and extent of the crime, (2) whether the violation was related to other illegal activities, (3) the other penalties that may be imposed for the violation, and (4) the extent of the harm caused."[10] (Dkt. 43, Court's Order of September 29, 2015, at 10) (quoting United States v. $132,245.00 in U.S. Currency, 764 F.3d 1055, 1058 (9th Cir. 2014)) (alterations in original).

The City claims that the initial $63 penalty and subsequent late payment penalties are not grossly disproportionate because "parking meter violations affect traffic flow and traffic congestion, and cause premium spots in front of businesses to be monopolized." (See Dkt. 113-1, Joint Br. at 29). According to the City, parking meter violations deprive the City of revenue which is used

---

[9] Many of the 17 "facts," however, are simply legal issues. (See, e.g., Dkt. 110-2, SUF at P1 ("Whether the City's current fines/penalties for parking meter violations are excessive because they are grossly disproportionate to the gravity of the offense."); id. at P2 ("Whether a parking meter violation is a serious or criminal offense."); id. at P16 (whether the City "conce[ded] that the current fine[s are] excessive"); id. at P17 (whether generating income is a "proper justification" for the City's fine amounts)).

[10] In denying defendant's motion to dismiss, the court held that fact-based questions under these factors precluded a liability determination at the pleadings stage. (See Dkt. 43, Court's Order of September 29, 2015, at 10-11).

to pay for the "maintenance, installation, repairs and security of parking meters, the design, construction and operation of off-street parking lots, and any other activities." (Id.). "Thus, the offense[s] committed by Plaintiffs in violating the parking meter laws harmed the community, local businesses and the City[.]"[11] (Id. at 29-30). The City also claims that it "has an interest in deterring" individuals from committing additional parking violations in the future. (See Dkt. 113-2, Joint Br. at 36).

Plaintiffs respond that the City's justifications "are either generalized assertions of harm without" factual support or, at minimum, raise factual disputes which preclude summary judgment. (See Dkt. 113-1, Joint Br. at 30). For instance, plaintiffs contend that the City's justification regarding the turnover of parking spaces is unsupported by the record. (See Dkt. 112-2, Joint Br. at 8; Dkt. 113-1, Joint Br. at 31). According to plaintiffs, the "way to reduce the amount of time meter vehicles are parked where turnover is desired is simply to cap the amount of time that can be purchased, rather than raising meter fines/penalties." (Dkt. 113-1, Joint Br. at 31). Finally, plaintiffs assert, in a conclusory manner, that "[p]arking meters have nothing to do with promoting or regulating traffic flow." (Dkt. 112-2, Joint Br. at 8). Plaintiffs' assertions are unpersuasive.

There is no dispute that – at least to some extent – drivers who commit parking meter violations affect traffic flow and congestion. Though plaintiffs purport to dispute this fact, they nevertheless admit that if "a vehicle is parked [in a space] outside" the time allotted by a meter, "it is possible, if there is traffic, it could affect traffic flow/congestion." (Dkt. 110-2, SUF at D16). Further, by limiting the time that drivers can remain in particular spaces, parking meters encourage turnover by allowing more people access to parking. (See id. at D17; Dkt. 110-1, Joint App'x at Exh. 1, Andalon Depo. II at 41). Plaintiffs attempt to dispute this fact by stating that the

---

[11] The City relies primarily on the testimony of its Rule 30(b)(6) witness, Robert Andalon, the Chief Management Analyst at the City's Department of Transportation since 2000, (see Dkt. 110-1, Joint App'x at Exh. 15, September 7, 2016, Deposition of Robert Andalon ("Andalon Depo. I") at 8), to support its argument regarding the justifications for the penalty schedule. (See Dkt. 113-1, Joint Br. at 29-30) (citing Dkt. 110-1, Joint App'x at Exh. 1, Andalon Depo. II at 41 (traffic congestion and traffic flow) & 96 (revenue from parking meters)); (see also id. at Exh. 26) (Los Angeles Department of Transportation statement that "Parking meters and time limits are used to encourage turnover, allowing more people access to high-demand parking spaces.").

9

1  "City provided testimony that some [business owners] prefer longer [parking] time periods and
2  some wanted shorter time limits" and that the "record is devoid of any evidence from any business
3  owner or property owner concerning 'turnover' or 'access to high-demand parking spaces.'" (Dkt.
4  110-2, SUF at D17).  However, that some business owners may prefer parking meters that allot
5  more time to their customers has no bearing on whether the meters actually encourage turnover.
6  In other words, plaintiffs' assertion about the City's lack of evidence relating to business owners
7  and turnover of vehicles is insufficient to a raise a factual dispute.  (See Dkt. 110-1, Joint App'x
8  at Exh. 1, Andalon Depo. II at 41) ("[I]f individuals violate [parking meter payment requirements],
9  [they] affect traffic congestion, traffic flow.").

10  Moreover, plaintiffs' argument that there is a factual dispute as to the deterrent effect of the
11  penalties because there is "no empirical or other evidence" such as a "study or survey" to support
12  the City's claim that penalties deter violations, (see Dkt. 112-1, Joint Br. at 7; see also Dkt. 113-1,
13  Joint Br. at 30-31), is unpersuasive.  It is well-established that monetary penalties provide a
14  deterrent to unlawful conduct.  See, e.g., Towers v. City of Chicago, 173 F.3d 619, 625-26 (7th
15  Cir.), cert. denied 528 U.S. 874 (1999) ("[T]he City, in fixing the amount, was entitled to take into
16  consideration that the ordinances must perform a deterrent function[] . . . . The $500 fine imposed
17  in this case is large enough to function as a deterrent, but it is not so large as to be grossly out
18  of proportion to the activity that the City is seeking to deter."); Disc. Inn, Inc. v. City of Chicago,
19  72 F.Supp.3d 930, 934-35 (N.D. Ill. 2014), aff'd, 803 F.3d 317 (7th Cir. 2015) (fine imposed for
20  violation of vacant lot ordinance appeared "to serve as a deterrent" for Eighth Amendment
21  purposes).

22  Plaintiffs also argue that the penalties in Los Angeles are 25 percent higher than the
23  penalties in neighboring cities such as Beverly Hills, Santa Monica, and Long Beach, and that Los
24  Angeles is the trend-setter in establishing "an ever-upward spiral" of increasing penalties in the
25  area.  (See Dkt. 112-2, Joint Br. at 8; Dkt. 113-1, Joint Br. at 32; Dkt. 113-2, Joint Br. at 38).
26  According to plaintiffs, the City's initial penalty of $63 is "26.35% higher than the average of $50"
27
28

for eight neighboring jurisdictions.[12] (Dkt. 113-2, Joint Br. at 37). However, plaintiffs deny that comparisons to other large metropolitan cities around the country, such as New York City, Chicago, or San Francisco are appropriate. (See Dkt. 112-2, Joint Br. at 8; Dkt. 113-2, Joint Br. at 38). Plaintiffs also contest that the penalties provide a deterrent effect on future violations, claiming that there was "no recognizable change in compliance [with parking meters] when the initial fine was raised from $40 (in 2006) to $63." (Dkt. 113-1, Joint Br. at 30; see id. (deterrence not achieved because "vast majority of meter violations are unintentional and inadvertent."); Dkt. 110-1, Joint App'x at Exh.18, Deposition of Jay Beeber ("Beeber Depo.") at 94-96).[13] According to plaintiffs, the City's real motivation in adopting its penalty schedule, which increased on a yearly basis from 2006 to 2012, is to "increase revenue to its General Fund, rather than to deter violators, promote turnover at meters, or meet underfunding [sic] of parking meter enforcement costs." (Dkt. 112-2, Joint Br. at 9). In the same vein, plaintiffs assert that meter penalties constituted 23 percent of all parking citations in fiscal year 2016, and that at least $41 million in parking violation revenue was transferred to the City's General Fund. (See id.).

Unlike arguments addressing the harm experienced by the City as a result of plaintiffs' offenses, arguments discussing penalties imposed by other cities and defendant's motivations in crafting the penalty schedule do not bear directly on the four factors courts consider when weighing the gravity of the relevant offense. Cf. $132,245.00 in U.S. Currency, 764 F.3d at 1058

---

[12] The parties primarily address the $63 initial penalty throughout their briefing, and the court agrees that it is relevant figure for the excessive fines analysis in this case. See, e.g., Wemhoff, 591 F.Supp.2d at 809 (even where they can continue to accrue indefinitely, late penalties are "not an inevitable feature of the [initial] penalty"); id. ("The fact that the overall fine has now grown to hundreds of dollars is more a reflection of Mr. Wemhoff's failure to timely pay or contest the original fine owed than it is a reflection of unconstitutional excess in the design of the late payment penalty."). The late penalties, which are subject to a separate disproportionality analysis vis a vis the underlying offense of nonpayment, are not grossly disproportionate in this case. See, e.g., id. (Nearly $500 in late fees not grossly disproportionate where initial penalty was $23); Popescu, 2008 WL 220281, at *4 (late payment penalty of $47, which doubled initial penalty, along with additional $10 late fee, amounting to a total of $104 not grossly disproportionate).

[13] The City objects to the testimony of Jay Beeber. (See Dkt. 113-1, Joint Br. at 33-34). The court need not resolve whether Beeber qualifies as an expert because, assuming he does and the court considers his testimony, the result is still the same.

(relevant factors include nature and extent of crime, relation to other illegal activities, other penalties that may be imposed, and the extent of the harm caused). Moreover, plaintiffs' comparison to penalties from neighboring jurisdictions shows that the City's initial penalty is only marginally higher than numerous other smaller cities in Los Angeles County. Indeed, plaintiffs admit that, on average, the City's $63 fine is only $13 higher than eight other cities in Los Angeles County. (See Dkt. 113-2, Joint Br. at 37). The differential is only $5 dollars when compared to Beverly Hills and only $10 when compared to Santa Monica and West Hollywood.[14] (See Dkt. 113-1, Joint Br. at 32).

Additionally, comparing the City's penalties to those imposed in other major metropolitan areas – such as New York City and Chicago, where initial meter penalties may amount to $65, or San Francisco where penalties can reach $76, (see Dkt. 113-1, Joint. Br. at 33) – shows that the City's penalties are lower than those imposed in other large cities. Plaintiffs argue that other large cities are not necessarily good comparators because their penalty schedules "may well involve lower fine to meter pricing ratios[.]" (See Dkt. 112-2, Joint Br. at 8). For example, plaintiffs assert that as "a matter of simple arithmetic," for an individual who overstays a one-dollar-per-hour meter[15] by six minutes, the applicable meter payment to fine "ratio is 630 to 1," i.e., $63 for $0.10 of parking time, and that "it is 210 to 1 as to a person who is less than 18 minutes over the meter, . . . 126 times the additional amount a person who is less than 30 minutes over the meter, . . . and the ratio of fine to damages is 63 to 1 as to a person who pays for none of that hour." (Dkt. 112-3, Joint Br. at 23). However, plaintiffs fail to provide to the court the actual fine to meter pricing ratios from the other cities, and plaintiffs cite no authority supporting their argument that a fine can be deemed unconstitutionally excessive simply on the basis that its ratio to the underlying cost of parking is too high. (See, generally, Dkts. 112 & 113). In addition, because the $63 penalty is

---

[14] Because plaintiffs make no argument as to whether these substantially similar fines are also excessive, (see, generally, Dkts. 112 & 113, Joint Br.), the court is left to question whether plaintiffs' position is that a fine is excessive, as a matter of law, based on a difference of $5 or $10.

[15] Plaintiffs assert, without citation to evidence, that "most parking meters in the City" charge a $1 per hour rate. (See Dkt. 112-1, Joint Br. at 6).

a one-time flat fee, the ratio of the penalty to the underlying parking cost of accrual diminishes over time. See Wemhoff, 591 F.Supp.2d at 809 ("the penalty's rate of accrual cannot be deemed unconstitutionally excessive. Because the $16 per month penalty is a flat fee, the rate of accrual diminishes over time.").

Plaintiffs argue that the typical deference due under the proportionality analysis does not apply here because the City's primary goal in raising the initial penalty from $40 to $63 was to increase revenue to the General Fund.[16] (See Dkt. 113-1, Joint Br. at 26-27). But the City's intent to use the meter penalty as a revenue source for its General Fund, even if it were mutually exclusive from the penalty's deterrent effect, does not render the penalty unconstitutionally excessive. The Supreme Court has held that policy makers are to be afforded wide deference in setting fine amounts. See Bajakajian, 524 U.S. at 336, 118 S.Ct. at 2037 ("judgments about the appropriate punishment for an offense belong in the first instance to the legislature [and r]eviewing courts should grant substantial deference to the broad authority that legislatures necessarily possess in determining . . . questions of legislative policy.") (internal quotation marks, citations, and ellipses omitted). Thus, even if the "amount of the fine seems less designed to punish or deter parking violators or protect public safety than to generate revenue[,]" such motivation does not necessarily amount to a violation of the Excessive Fines Clause. See Popescu, 2008 WL 220281, at *4 n. 2 (a city's intent to increase revenue through parking citation does not necessarily defeat summary judgment).

---

[16] Plaintiffs appear to mischaracterize the City's position regarding deference, claiming that the City asserts that "determination of fines is immune from court review under the Excessive Fines Clause[.]" (See Dkt. 113-1, Joint Br. at 26). But the City does not claim that its decision-making is "immune" from review. (See, generally, Dkt. 112-3, Joint Br. at 24-25). In addition, plaintiffs' reliance on Hale v. Morgan, 22 Cal.3d 388 (1978), (Dkt. 113-1, Joint Br. at 26-27), for the proposition that less deference should be afforded to the City is unpersuasive. In Hale, a case concerning due process claims which are no longer at issue here, (see Dkt. 42, Court's Order of September 29, 2015, at 17), the court held that a statute which provided a "mandatory, mechanical, potentially limitless" fine for housing violations could be unconstitutionally excessive in some circumstances, such as in regard to the $17,300 fine at issue in that case. See 22 Cal.3d at 404-05. The Hale court did not address Eighth Amendment claims or address the Supreme Court's Bajakajian decision. See, generally, 22 Cal.3d 388.

Further, plaintiffs fail to address how, if at all, the $12.50 to $17.50 state and county assessments affect the proportionality analysis. (See, generally, Dkts. 112 & 113). For example, plaintiffs fail to explain whether the assessment amounts should be deducted from the analysis because the City has no control over that amount. (See, generally, id.). Likewise, while the record is unclear as to what portion of the meter penalty goes to fund parking meter enforcement as opposed to what portion goes to the General Fund, it is undisputed that at least some amount – perhaps as much as 75 percent – is used to fund enforcement. (See, e.g., Dkt. 110-2, SUF at D15) (for fiscal year 2016, roughly 75 percent of revenue generated from all parking citations, including but not limited to meter violations, went to funding parking enforcement operations, and the other 25 percent was contributed to the City's General Fund). Yet plaintiffs fail to address how the distribution of penalty revenues should be considered in the proportionality analysis.[17] (See, generally, Dkts. 112 & 113).

Moreover, while the court disagrees with defendant regarding whether plaintiffs' ability to pay the penalty is relevant to the proportionality analysis,[18] (see Dkt. 43, Court's Order of September 29, 2015, at 11) (Ability to pay "is relevant to the proportionality analysis.") (citing, e.g., Bajakajian, 524 U.S. at 335-36, 118 S.Ct. at 2037 (discussing precedent requiring that fines should be "proportioned to the offense and that they should not deprive a wrongdoer of his livelihood")); People ex rel. Lockyer v. R.J. Reynolds Tobacco Co., 37 Cal.4th 707, 728 (2005) (citing with approval City and Cnty. of San Francisco v. Sainez, 77 Cal.App.4th 1302, 1320-22 (2000) (review denied May 10, 2000) ("we agree, that in the case of fines . . . the defendant's

---

[17] The court raised this issue as a concern in one of its previous orders. (See Dkt. 43, Court's Order of September 29, 2015, at 10) (querying as to what "portion of defendant's $63 initial penalty or $126 or $175 increased penalty is punitive and what portion bears some relationship to the gravity of the offense[.]").

[18] The court is unpersuaded by the City's reliance on United States v. Emerson, 107 F.3d 77 (1st Cir. 1997) and Duckworth v. U.S. ex rel. Locke, 705 F.Supp.2d 30 (D.D.C. 2010) to support the argument that "ability to pay is not a [proper] consideration" here. (See Dkt. 113-1, Joint Br. at 34). Emerson was decided before the Supreme Court's decision in Bajakajian, and Duckworth's analysis appears to rely, almost exclusively, on Emerson. See Duckworth, 705 F.Supp.2d at 48.

14

1 ability to pay is a factor under the Excessive Fines Clause.") (internal quotation marks and citation
2 omitted)), this factor alone cannot defeat summary judgment. Plaintiffs appear to "raise[] only a
3 facial challenge to the fines imposed" and a "facial challenge to a legislative Act, is of course, the
4 most difficult challenge to mount successfully, since the challenger must establish that no set of
5 circumstances exists under which the Act would be valid." Disc. Inn, Inc., 72 F.Supp.3d at 935;
6 (see Dkt. 44, SAC at ¶ 47) (The "class is defined as all persons who are or were assessed and/or
7 paid the penalties under the Schedule for parking at an unpaid or expired meter[.]"). Further,
8 plaintiffs' SAC does not single out the poorest residents for the excessive fines claim, as the class
9 definition includes "all persons" assessed a meter penalty. (See Dkt. 44, SAC at ¶ 47). In any
10 event, plaintiffs have identified no authority to support their contention that a parking ticket in the
11 amount of $63, even for low-income persons, is unconstitutionally excessive. (See, generally,
12 Dkts. 112 & 113, Joint Br.).

13 In short, there is no genuine dispute that plaintiffs' meter violations impose harm on the City
14 through their effects on traffic flow, congestion, and fiscal loss. Even if the harm imposed is
15 minimal, the $63 penalty is not grossly disproportionate to the harm as to violate the Eighth
16 Amendment or the California Constitution. Indeed, plaintiffs have not cited to a single case in
17 which an excessive fines claim for a parking or other traffic citation survived summary judgment.
18 (See, generally, Dkts. 112 & 113, Joint Br.). To the contrary, all of the Eighth Amendment cases
19 cited by the parties in the context of parking violations, and all of the authorities found by the court
20 on its own review, support dismissal here. See, e.g., Popescu, 2008 WL 220281, at *4 ($47 initial
21 penalty); Wemhoff, 591 F.Supp.2d at 809 ($519 total penalty); Shibeshi v. City of New York, 2011
22 WL 13176091, *2 (S.D.N.Y. 2011), aff'd, 475 F.Appx. 807 (2d Cir. 2012) (Plaintiff's "fines totaling
23 $515.16 for four tickets, plus additional fees, are not disproportional, especially when he does not
24 indicate any efforts to challenge those tickets that repeatedly notified him of the same alleged
25 traffic violations."); Towers, 173 F.3d at 625-26 ("The $500 fine imposed in this case is large
26 enough to function as a deterrent, but it is not so large as to be grossly out of proportion to the
27 activity that the City is seeking to deter."); Disc. Inn, Inc., 72 F.Supp.3d at 934-35 (facial challenge
28

to maximum fines of $1,200 and $600 unsuccessful because fines not "grossly disproportionate to the offenses under all circumstances").

## CONCLUSION

Based on the foregoing, IT IS ORDERED THAT:

1. Defendant's Motion for Summary Judgment (Document No. 110) is **granted**.
2. Plaintiffs' Motion for Class Certification (Document No. 119) is **denied** as **moot**.[19]
3. Judgment shall be entered accordingly.

Dated this 21st day of May, 2018.

_____/s/_____
Fernando M. Olguin
United States District Judge

---

[19] While courts typically resolve the issue of class certification before summary judgment, it is appropriate under the circumstances of this case for the court to first rule on the issue of summary judgment. See, e.g., Eller v. EquiTrust Life Ins. Co., 778 F.3d 1089, 1092 (9th Cir. 2015) (affirming district court where it granted summary judgment to defendant and then "denied class certification as moot").